**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Herbert N. BELT, Defendant-Appellant.**

No. 76–3110.

United States Court of Appeals,
Fifth Circuit.

June 13, 1978.

Donald M. Briskman (court-appointed), Mobile, Ala., for defendant-appellant.

William A. Kimbrough, Jr., U. S. Atty., William R. Favre, Jr., E. T. Rolison, Jr., Ginny S. Granade, Asst. U. S. Attys., Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, HILL and FAY, Circuit Judges.

GODBOLD, Circuit Judge:

Belt was jointly tried and convicted with codefendant Williams of ten counts of embezzling, stealing, or unlawfully and willfully converting to his own use, or the use of another, the funds of a labor organization in contravention of 29 U.S.C. § 501(c). We hold that the trial judge erred in failing to grant a judgment of acquittal at the close of the government's case.[1]

As vice-president and assistant business agent for Teamsters Local 991, Belt represented employees of more than 20 companies in Alabama, Florida and Mississippi. When the alleged malfeasance occurred Belt was representing striking employees at the Pepsi-Cola plant in Mobile. Belt, with the approval of the local's chief business agent, had hired Williams to assist in managing the strike and to act as strike captain.

To assist striking employees, the Teamsters' International Office in Washington, D. C., pays lump-sum strike benefits to local unions, which then distribute weekly checks to employees who walk the picket line or otherwise actively participate in the strike. Local 991 sent to the International headquarters a list of eligible employees compiled by the bookkeeper. The International disbursed a single check to the local, which deposited it and then drew separate checks for individual employees. If an employee whose name was sent to the International Office had not walked the picket line or otherwise actively participated in the strike, his strike benefits were refunded to the International headquarters. Belt and Williams were accused of diverting some of these funds disbursed by the International for local employees by falsely endorsing and cashing checks made payable to employees who had not participated in the strike.

The government's case contained only the background testimony of Belt's supervisor, the testimony of named payees of strike checks allegedly diverted, and the testimony of Leon, a store proprietor who had cashed most of the allegedly converted checks. At the close of the government's case, Belt moved for a judgment of acquittal, which was denied, and he rested without putting on any evidence. Belt's codefendant, Williams, put on some third-party testimony, several character witnesses, and took the stand. Williams' testimony tended to incriminate Belt and supplied elements missing in the government's case. Belt's attorney cross-examined Williams and called in rebuttal the bookkeeper to show that only Williams had access to the checks after the second week of the strike and the government agent to testify that Leon had stated that another man (identified as Williams) "always brought the checks in." At the close of all the evidence Belt again moved for judgment of acquittal and again the motion was denied.

---

1. Therefore, we need not consider whether Belt was entitled to be tried separately from Williams and whether the undisclosed pretrial conversation of a juror with a person who knew Belt and who thought he was a "crook" requires invalidation of the jury verdict.

**1236**

■ This circuit follows the so-called "waiver doctrine,"[2] holding that a defendant who puts on evidence in his own behalf foregoes appellate review of his motion for judgment of acquittal[3] made at the close of the government's case.[4] Whether the defendant puts on evidence in his own behalf thus determines the focus of appellate review of sufficiency of the evidence. If the defendant does not introduce evidence after moving for a judgment of acquittal at the close of the government's case, we look only to the evidence in the government's case.[5] If the defendant introduces evidence after moving for a judgment of acquittal and at the close of all the evidence again moves for judgment of acquittal, we examine the entire record.[6] In the circumstances of this case we hold that Belt did not forego appellate review of his mid-trial motion for judgment of acquittal by cross-examining his codefendant and calling witnesses to rebut the codefendant's testimony.

This circuit has not directly considered the effect of cross-examination and rebuttal testimony on a mid-trial motion for acquittal.[7] Clearly, a defendant who takes the stand, whether tried jointly or separately, surrenders appellate review of his earlier motion.[8] Similarly, a defendant being tried alone loses review of the previous motion by producing witnesses to rebut the government's case, or to establish a defense (such as alibi), or to testify to his own good character.[9] These cases, however, do not deal directly with the case of a jointly tried defendant who rests after his motion for judgment of acquittal is denied and later is faced with adverse testimony by his codefendant. Of course, the fact that the codefendant testifies does not eliminate the appealing defendant's right to review of his own rule 29(a) motion.[10] A defendant may also retain review of his mid-trial motion if, after he rests, he recalls a government witness for continued cross-examination. *U. S. v. Perez*, 526 F.2d 859, 864 n. 10 (CA5), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976).[11]

The waiver doctrine is not mere formalism but is an expression of our adversary justice system which requires a defendant to accept the risks of adverse testimony that he introduces. The doctrine's operative principle is not so much that the defendant offering testimony "waives" his earlier motion but that, if he presents the testimony of himself or of others and asks the jury to evaluate his credibility (and that of his witnesses) against the government's case, he cannot insulate himself from the

**2.** *See U. S. v. Perez*, 526 F.2d 859 (CA5), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976).

**3.** Fed.R.Crim.P. 29(a) provides for motions for acquittal.

**4.** *See, e. g., U. S. v. Jackson*, 444 F.2d 1389 (CA5, 1971); *U. S. v. Rawls*, 421 F.2d 1285 (CA5, 1970).

**5.** *See, e. g., U. S. v. Henderson*, 524 F.2d 489 (CA5, 1975).

**6.** *See, e. g., Cullifer v. U. S.*, 413 F.2d 300 (CA5, 1969); *O'Neal v. U. S.*, 411 F.2d 131 (CA5), *cert. denied*, 396 U.S. 827, 90 S.Ct. 72, 24 L.Ed.2d 77 (1969); *U. S. v. Gordon*, 410 F.2d 1121 (CA5), *cert. dism.*, 396 U.S. 938, 90 S.Ct. 283, 24 L.Ed.2d 240 (1969).

**7.** The majority of our cases simply reiterate that the defendant loses consideration of his motion for judgment of acquittal by introducing evidence, but do not specify whether the defendant took the stand or merely produced witnesses. *See U. S. v. Wallace*, 417 F.2d 522

(CA5, 1969); *U. S. v. Gordon, supra; O'Neal v. U. S., supra; Cullifer v. U. S., supra; U. S. v. Jackson, supra; Meeks v. U. S.*, 259 F.2d 328 (CA5, 1958); *Tomley v. U. S.*, 250 F.2d 549 (CA5, 1957), *cert. denied*, 356 U.S. 928, 78 S.Ct. 716, 2 L.Ed.2d 759 (1958).

**8.** *See U. S. v. Arias-Diaz*, 497 F.2d 165 (CA5, 1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Montoya v. U. S.*, 402 F.2d 847 (CA5, 1968); *Harris v. U. S.*, 285 F.2d 85 (CA5, 1960), *cert. denied*, 368 U.S. 820, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961); *T'Kach v. U. S.*, 242 F.2d 937 (CA5, 1957).

**9.** *See U. S. v. Rawls, supra.*

**10.** *U. S. v. Arias-Diaz, supra; Clark v. U. S.*, 293 F.2d 445 (CA5, 1961).

**11.** If the defendant recalls the government witness to present direct testimony rebutting the government's case, he foregoes review of the government's case standing alone. *U. S. v. Edwards*, 488 F.2d 1154 (CA5, 1974).

risk that the evidence will be favorable to the government.[12] Requiring the defendant to accept the consequences of his decision to challenge directly the government's case affirms the adversary process. But the decision of a codefendant to testify and produce witnesses is not subject to the defendant's control like testimony the defendant elects to produce in his own defensive case, nor is such testimony within the government's power to command in a joint trial. Belt engaged in cross-examination and produced testimony solely because of his codefendant's testimony and directed his efforts to refuting that testimony. He did not attempt to refute any element of the proof adduced in the government's case.

Permitting cross-examination and rebuttal of the codefendant confined to the substance and credibility of the codefendant's testimony vindicates the interest of requiring the government to prove its case while at the same time does no violence to the underpinnings of the "waiver" doctrine. To deny a jointly tried defendant the benefit of his prior motion if he cross-examines and rebuts the codefendant's testimony would erode the defendant's right to require the government to prove every element of the case against him.[13] Such a rule would permit the government in a joint trial, after it has rested its case and after a defendant has tested the sufficiency of the evidence by motion for judgment of acquittal, to rely on a testifying codefendant to supply missing links in its case.

The result we reach is a limited one, applying only to a joint trial and to cross-examination and third-party testimony elicited by the appealing defendant and directed solely to the codefendant's credibility and character. So long as the defendant contents himself with cross-examination of the codefendant and testimony aimed at vitiating the inculpatory testimony given by the codefendant rather than brought forward by the government, the adversarial purpose of the waiver doctrine is left untouched. *See Cephus v. U. S.,* 117 U.S.App. D.C. 15, 19–20, 324 F.2d 893, 897–98 (1963). Thus we evaluate the sufficiency of the evidence to convict Belt solely in terms of the proof presented in the government's case-in-chief.

The great majority of cases considering the elements of a case under 29 U.S.C. § 501(c) involve either unauthorized expenditure of union funds[14] or use of union funds for personal benefit.[15] Those cases primarily focus on whether the defendant had the requisite specific intent to deprive the union of its funds. Belt's case is somewhat more rudimentary in that the primary question is whether Belt participated in any criminal sense in the alleged conversion of funds.

The crimes proscribed by the statute are embezzling, stealing, or unlawfully and willfully abstracting or converting to one's own use or the use of another the funds of a labor organization. We have interpreted § 501(c) as a remedial statute creating a new federal crime to be given its broadest construction to reach the ills it was designed to counteract. *See U. S. v. Nell,* 526 F.2d 1223 (CA5, 1976), *appeal after remand,* 570 F.2d 1251 (CA5, 1978); *U. S. v. Sullivan,* 498 F.2d 146 (CA1), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974). Thus the duty imposed by the statute may be more stringent than that imposed by the common law if necessary to fulfill the statutory purpose. *U. S. v. Nell,* 526 F.2d at 1232; *cf. U. S. v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Nevertheless, because the statute is a criminal one,

12. *See U. S. v. Arias-Diaz, supra.*

13. *See generally Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881; 44 L.Ed.2d 508 (1976).

14. *See, e. g., U. S. v. Ottley,* 509 F.2d 667 (CA2, 1975); *U. S. v. Goad,* 490 F.2d 1158 (CA8), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974); *U. S. v. Boyle,* 157 U.S.App.D.C. 166, 482 F.2d 755, *cert. denied,* 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973); *U. S. v. Silverman,* 430 F.2d 106 (CA2, 1970).

15. *See, e. g., U. S. v. Nell,* 526 F.2d 1223 (CA5, 1976), *appeal after remand,* 570 F.2d 1251 (CA5, 1978); *U. S. v. Santiago,* 528 F.2d 1130 (CA2), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *U. S. v. Dibrizzi,* 393 F.2d 642 (CA2, 1968).

we must be wary of a too-broad construction that goes beyond congressional intent or power.

■ The acts made criminal are broad enough to cover every sort of taking [16] that injures the inchoate rights of the union to the beneficial use of the funds. *See U. S. v. Harmon,* 339 F.2d 354 (CA6, 1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1025, 13 L.Ed.2d 963 (1965); *cf. Morissette v. U. S.,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In addition to proof that the defendant caused a taking of union funds, the government must prove that the defendant acted with specific intent to deprive the union of its funds. *See U. S. v. Goad,* 490 F.2d 1158 (CA8), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974); *U. S. v. Dibrizzi,* 393 F.2d 642 (CA2, 1968); *U. S. v. Hart,* 417 F.Supp. 1314 (S.D.Iowa, 1976). Far from describing a strict liability crime, the statute requires either the felonious intent necessary to comprise embezzlement and stealing or a willful, knowing conversion or abstraction. Although willfulness may connote a lesser degree of intent, the government must nevertheless show that the defendant was sufficiently aware of the facts to know that he was acting wrongfully and in contravention of the trust placed in him by the union and its members. *See Morissette v. U. S., supra; U. S. v. Illinois Central R. R.,* 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938) (willfully means with evil purpose, criminal intent, or the like); *U. S.*

*v. Santiago,* 528 F.2d 1130 (CA2), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976) (no liability if defendant has good faith belief that funds are being used for union benefit); *U. S. v. Ottley,* 509 F.2d 667 (CA2, 1975) (same).[17] The government's evidence of both Belt's participation in the alleged conversion and his intent to commit the alleged crime was insufficient under any test employed by this circuit to test the sufficiency of the evidence to convict.[18]

The government first called Belt's supervisor who testified that the International Union disbursed a weekly lump-sum check to the local based on a roster of union members kept by the local's bookkeeper. The bookkeeper prepared individual strike benefit checks based on the roster, sometimes deducting union dues on directions from Belt. Both Belt and the strike captain had authority to pick up and distribute checks to the strikers at the plant. Strikers were only eligible to receive checks if they walked the picket line or otherwise participated actively in the strike. Checks made out to those not actively participating were to be cancelled and the funds returned to the International. This background testimony established only that Belt had the authority to pick up and distribute checks.

The allegedly converted checks were made out to ten former Pepsi employees, all of whom testified. Their testimony established only that they did not receive, en-

---

**16.** The Supreme Court has interpreted the crime of "stealing" to cover all felonious takings with intent to deprive the owner of the rights and benefits of ownership. *See U. S. v. Turley, supra.* Since "stealing" has no pedigree as a common-law crime, *id.,* the definition of the elements of the crimes at common law provides little guidance and certainly no inflexible checklist of elements of proof. *Accord U. S. v. Nell, supra.*

**17.** We have held that the government need not establish a lack of benefit to the union as an element of its case. *U. S. v. Nell, supra.* Because intent will generally be proven circumstantially, however, *U. S. v. Vitale,* 489 F.2d 1367 (CA6, 1974), lack of union benefit is one means of establishing the specific intent to defraud. *U. S. v. Nell,* 526 F.2d at 1233 n. 13.

**18.** This circuit employs two statements of the test for evaluating the sufficiency to support a conviction of both direct and circumstantial evidence. *See U. S. v. Warner,* 441 F.2d 821 (CA5), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The test can be stated as whether the jury could reasonably, logically, and legally infer from the evidence presented that appellant was guilty of violating the statute beyond a reasonable doubt. *See, e. g., U. S. v. Smith,* 546 F.2d 1275 (CA5, 1977). Or, we may inquire whether "reasonable jurors could find the evidence . . . inconsistent with every hypothesis of innocence." *See U. S. v. Edwards,* 549 F.2d 362 (CA5, 1977), *cert. denied,* 434 U.S. 828, 98 S.Ct. 107, 54 L.Ed.2d 87; *U. S. v. Wyers,* 546 F.2d 599 (CA5, 1977); *U. S. v. Pigman,* 546 F.2d 609 (CA5, 1977). The difference is purely a semantical one. *U. S. v. Smith,* 546 F.2d at 1284 n. 3.

dorse, or authorize endorsement of the checks. None had participated in the strike and thus none were entitled to receive the checks. Most recalled applying for union membership, which accounts for the fact that their names appeared on the roster from which the names of payees were drawn. The government points out that these witnesses knew Belt and not Williams, but this is of little import since all had left Pepsi prior to the time Williams became strike captain.

The government's final witness was Leon, the store proprietor who had cashed most of the checks. He also failed to tie Belt to the scheme. Belt asked Leon, a long-time acquaintance, to have enough money on hand each week to cash strike checks and to expect a young man to bring them in. Leon identified Williams as the person who brought the checks in weekly. Although his recall was hazy, Leon thought that on one occasion before Williams began bringing the checks in, Belt might have presented checks to be cashed.

Thus, except for the single incident just described, the government proved nothing that connected Belt to the critical interval between the time the bookkeeper made out the checks and the time Williams presented them, already endorsed, to be cashed by Leon. Although Leon's equivocal testimony suggested that Belt may have presented the first set of checks to Leon, the acts charged in the indictment all occurred after Williams became strike captain. Leon unequivocally testified that, after the early days of the strike, Williams alone presented the checks to be cashed. No evidence in the government's case shows that Belt endorsed the checks that he is charged with diverting, that he told Williams to endorse them, that he knew the checks were being falsely endorsed, or that Belt received any of the funds.[19] The government's evidence does not permit an inference that Belt beyond reasonable doubt participated in the scheme. It would be equally logical to conclude from the government's evidence that Williams acted alone.

The government asks us to give great significance to the undisputed testimony that Belt created the arrangement with Leon that permitted Williams to cash the checks. This evidence, however, does not tend inexorably to support an inference of guilt because it is equally capable of supporting Belt's theory of innocence, i. e., that he procured the arrangement so that the strikers, most of them young blacks (who under Belt's theory might have trouble cashing checks), could endorse their checks and have them cashed by a Teamster official who would then return them the cash.

The evidence also did not demonstrate that Belt had the specific intent to deprive the union of its funds. The slight circumstantial evidence adduced by the government did not place Belt in any position to know that illegal endorsements were being made or that funds were going to anyone other than strikers who were entitled to them. At a minimum, the government had to show that Belt possessed sufficient knowledge of the facts to understand that he was acting wrongfully. *Morissette, supra.* Other than Belt's knowledge of the arrangement with Leon, which is consistent with innocence, no other facts imputing knowledge to Belt were proven.

 We also conclude that the government did not produce sufficient evidence to convict Belt for aiding and abetting Williams. One indicted as a principal may be convicted as a principal if the government shows that he aided and abetted the crime. 18 U.S.C. § 2(a). To aid and abet means to assist the perpetrator of the crime while sharing in the requisite criminal intent. *U. S. v. Trevino,* 556 F.2d 1265 (CA5, 1977). The evidence must show that the defendant was associated with the criminal venture, that he participated in it as something he

---

19. The government need not place the funds in the defendant's pocket. *Doyle v. U. S.,* 318 F.2d 419 (CA8, 1963). Conversion "to his own use" simply means " 'not to the use of the entruster.' " *U. S. v. Santiago, supra.* Never-

theless, the government must produce enough evidence to show that the defendant was a cause of the conversion and knowingly participated in it. *See U. S. v. Lynch,* 366 F.2d 829 (CA3, 1966); *U. S. v. Dibrizzi, supra.*

wished to bring about, and that he sought by his action to make it succeed. *Clark v. U. S.*, 293 F.2d 445 (CA5, 1961). The elements of aiding and abetting may thus be stated: 1) the defendant knew the venture was occurring; 2) he associated himself with the act; 3) he participated in it as something he wished to bring about; and 4) he committed some overt act to make it a success. *U. S. v. Martinez*, 555 F.2d 1269 (CA5, 1977).

The proof that Belt arranged for the checks to be cashed at Leon's arguably fulfills the overt act element. None of the evidence, however, demonstrated that Belt knew that the venture of diverting funds through use of the Leon arrangement was occurring or that he shared the criminal intent to deprive the union or its members of funds. The mere fact that Belt procured the arrangement that made the conversion possible does not support guilt without proof that Belt knew the arrangement was being used for a purpose detrimental to the union. *Morissette, supra; see generally, U. S. v. Ottley, supra; U. S. v. Santiago, supra; U. S. v. Dibrizzi, supra.* The government's evidence did not place Belt in a position to know anything more than that Williams was cashing checks for strikers. The bare fact that the checks were wrongfully endorsed and cashed under a system arranged by Belt does not bring Belt within the sweep of the statute.

Because the judgment of acquittal made at the conclusion of the government's case should have been granted, the case is REVERSED and REMANDED with directions to enter a judgment of acquittal.